IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| UMB Bank, N.A. as trustee of $45,000,000 West Virginia Economic Development Authority Solid Waste Disposal Facility Revenue Bonds (Wyoming County Coal Project), Series 2023, | ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| Wyoming County Coal, LLC; ReElement Technologies Corporation; Knott County Coal LLC; Land Betterment Corporation; McCoy Elkhorn Coal LLC; American Infrastructure Corporation; and American Resources Corporation, | ) ) ) ) ) ) |
| Defendants. | ) ) |

Case No. __1:25-cv-2596__

## VERIFIED COMPLAINT

### Introduction

In 2023, the Defendants secured $45 million in public bond financing from the West Virginia Economic Development Authority to revive a shuttered coal mine by the end of 2024 and develop valuable rare-earth mineral extraction. This investment, under the Defendants' control, was supposed to create West Virginia jobs and represent "an example of just the type of innovation that will help ensure the United States remains a global energy leader [and] that West Virginia remains at the forefront of American steel manufacturing while building a new domestic supply chain of critical minerals that reduces our dependence on China," according to then-Senator Joe Manchin.[1] Defendants delivered none of it. Instead of developing the project, the Defendants

---

[1] *See* June 1, 2023 American Resources Corporation press release (last accessed December 19, 2025, https://wyomingcounty.com/2023/06/american-resources-corporations-integrated-rare-earth-critical-element-and-metallurgical-carbon-processing-facility-signs-bond-purchase-agreement-for-45000000/)

funneled millions in public bond proceeds out of West Virginia through a web of fraudulent transfers to benefit themselves. Today, the mine remains dark, idle, and rusted out; over $40 million has vanished and cannot be accounted for by the Defendants. Rather than use public financing to lift West Virginia's economy, the Defendants delivered no mine, no jobs, and no development—only a trail of self-dealing and misrepresentations. In light of the Defendants' breaches of their obligations, Plaintiff UMB Bank, N.A., not individually, but solely in its capacity as trustee for the bondholders (the "Trustee"), brings this action to hold the Defendants to account for the money they owe to the bondholders.

More specifically, the Trustee seeks to enforce the bond documents securing the $45,000,000 Solid Waste Disposal Facility Revenue Bonds (Wyoming County Coal Project), Series 2023 (the "Bonds"), issued by the West Virginia Economic Development Authority for the benefit of Defendant Wyoming County Coal, LLC (the "Borrower WC Coal"). Borrower WC Coal, the owner and operator of the coal and rare-earth project in Wyoming County, West Virginia (the "Project"), has broken its promise to use the $45 million to construct, maintain, and operate the Project near the town of Oceana in Wyoming County, West Virginia.

Borrower WC Coal continues to breach its obligations, including through its refusal to make required payments and its total failure to provide basic financial reports. In addition, Borrower WC Coal fraudulently transferred funds that were supposed to go toward developing the Project in West Virginia to its own insiders and affiliates outside the state, including millions in Bond proceeds sent to other entities whose executives are conspicuously the same people as Borrower WC Coal's.

With this action, the Trustee seeks to recover the money that is owed to the bondholders—including by unraveling the fraudulent transfers to and among Borrower WC

2

Coal's various affiliates and related parties: Defendants ReElement Technologies Corporation, Knott County Coal LLC, Land Betterment Corporation, McCoy Elkhorn Coal LLC, American Infrastructure Corporation, and American Resources Corporation ("Defendants")—and states and alleges as follows:

### Parties, Jurisdiction, and Venue

1. The Trustee is a national banking association with its main corporate trust office located in Minneapolis, Minnesota and its principal place of business located in Kansas City, Missouri. The Trustee brings this action not in its individual capacity, but solely as trustee under the terms of the Indenture (as defined below) on behalf of the beneficial holders of the Bonds.

2. Borrower WC Coal is an Indiana limited liability company with its principal place of business at 12115 Visionary Way, Suite 174, Fishers, Indiana 46038.

3. The guarantor for the Bonds is American Infrastructure Corporation, formerly known as American Carbon Corporation ("Guarantor American Infrastructure Corporation"), which is an Indiana corporation and the sole member of Borrower WC Coal with the same principal place of business: 12115 Visionary Way, Suite 174, Fishers, Indiana 46038.

4. At all relevant times, Guarantor American Infrastructure Corporation was a wholly owned subsidiary of a parent entity called American Resources Corporation, which is a Florida corporation with the same principal place of business as both Borrower WC Coal and Guarantor American Infrastructure Corporation: 12115 Visionary Way, Suite 174, Fishers, Indiana 46038.

5. Knott County Coal LLC is a Delaware limited liability company whose sole member is Guarantor American Infrastructure Corporation that has the same principal place of business as Borrower WC Coal, Guarantor American Infrastructure Corporation, and their collective parent, American Resources Corporation: 12115 Visionary Way, Suite 174, Fishers, Indiana 46038.

6.      Land Betterment Corporation is a benefit corporation incorporated in Indiana with the same principal place of business as Borrower WC Coal, Guarantor American Infrastructure Corporation, Knott County Coal LLC, and their collective parent, American Resources Corporation: 12115 Visionary Way, Suite 174, Fishers, Indiana 46038.

7.      ReElement Technologies Corporation is incorporated in Indiana with the same principal place of business as Borrower WC Coal, Guarantor American Infrastructure Corporation, Knott County Coal LLC, Land Betterment Corporation, and their collective parent, American Resources Corporation: 12115 Visionary Way, Suite 174, Fishers, Indiana 46038.

8.      McCoy Elkhorn Coal LLC is an Indiana limited liability company whose sole member is Guarantor American Infrastructure Corporation with the same principal place of business as Borrower WC Coal, Guarantor American Infrastructure Corporation, American Resources Corporation, Knott County Coal LLC, Land Betterment Corporation, ReElement Technologies Corporation, and their collective parent, American Resources Corporation: 12115 Visionary Way, Suite 174, Fishers, Indiana 46038.

9.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the action is between citizens of different states.

10.     Venue exists in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because the Defendants are domiciled in Indiana.

**Factual Allegations**

A.      **Borrower WC Coal's Related Parties Under Common Ownership and Control**

11.     At all relevant times, each of the Defendants—Borrower WC Coal, Guarantor American Infrastructure Corporation, Knott County Coal LLC, Land Betterment Corporation, ReElement Technologies Corporation, and McCoy Elkhorn Coal LLC—was part of the same family of corporate entities, all under the ownership or control of the same corporate parent,

American Resources Corporation, and all under the management and oversight of substantially the same directors, officers, or persons in control.

12.     Upon information and belief, the following individuals are directors, officers, or persons in control of Borrower WC Coal:

        a.    Mark Jensen is the former Chief Executive Officer;

        b.    Thomas Sauve is the former President;

        c.    Kirk Taylor is the Chief Financial Officer;

        d.    Tarlis Thompson is the current Chief Executive Officer;

        e.    Greg Jensen is the General Counsel;

        f.    Lisa Little is the Head of Human Resources; and

        g.    Kristie Sloan is the Director of Environmental Solutions.

13.     Upon information and belief, the following individuals are directors, officers, or persons in control of Guarantor American Infrastructure Corporation, each of whom is also a director, officer, or person in control of Borrower WC Coal:

        a.    Mark Jensen is the Executive Chairman of the Board;

        b.    Tarlis Thompson is the Director and Chief Executive Officer;

        c.    Lisa Little is the Head of Human Resources; and

        d.    Kristie Sloan is the Director of Environmental Solutions.

14.     Upon information and belief, the following individuals are directors, officers, or persons in control of American Resources Corporation, each of whom is also a director, officer, or person in control of Borrower WC Coal:

        a.    Mark Jensen is the Chief Executive Officer;

        b.    Thomas Sauve is the President and Director;

      c.      Kirk Taylor is the Chief Financial Officer;

      d.      Tarlis Thompson is the Chief Operating Officer;

      e.      Lisa Little is the Head of Human Resources; and

      f.      Kristie Sloan is the Head of Environmental Solutions

15.     Upon information and belief, the following individuals are directors, officers, or persons in control of Land Betterment Corporation, each of whom is also a director, officer, or person in control of Borrower WC Coal:

      a.      Kirk Taylor is the President, Chief Financial Officer, and a Director;

      b.      Thomas Sauve is the Chief Development Officer and a Director;

      c.      Tarlis Thompson is the Director of Operations;

      d.      Lisa Little is the Director of Human Resources; and

      e.      Kristie Sloan is an Environmental Specialist.

16.     Upon information and belief, the following individuals are directors, officers, or persons in control of ReElement Technologies Corporation, each of whom are also directors, officers, or persons in control of Borrower WC Coal:

      a.      Mark C. Jensen is the Chief Executive Officer;

      b.      Kirk Taylor is the Chief Financial Officer; and

      c.      Thomas Sauve is in charge of Business Strategy and Development.

17.     In connection with the West Virginia Economic Development Authority's issuance of $45,000,000 in Bond proceeds, Borrower WC Coal created a Limited Offering Memorandum dated May 31, 2023 (attached as **Exhibit A**), which, among other things, described Borrower WC Coal and Guarantor American Infrastructure Corporation (which was formerly

known as "American Carbon Corporation") as "wholly-owned subsidiaries" of their parent, American Resources Corporation. (Ex. A at 3.)

18.     In seeking investment in the Project, Borrower WC Coal described three phases of development in Wyoming County, West Virginia, "each maximizing the efficiency and revenue generation of the project." (*Id.* at A-10.)

19.     The first stated phase of Project development was to "be focused on site work, rail loadout facility rehabilitation and reconstruction of the coal wash and processing facility," all to create "a 'best-in-class' processing and logistics hub which will allow for near term revenue to be generated from tolling arrangements with regional third-party coal mining companies." (*Id.*)

20.     The second stated phase involved "construction and operational capability of [an] Electrolysis processing facility" to "allow for onsite processing of rare earth elements collected from the coal waste streams," which would "[lower] the overall material handlings costs while bringing high-tech and electrification industry jobs to the community" by monetizing "carbon production," "hydrogen production," "graphene slurry," and "rare earth and battery metals concentrate." (*Id.* at A-10 to -11.)

21.     The third and final phase was "creation and expansion of the metallurgical coal operations." (*Id.* at A-11.)

22.     In short, Borrower WC Coal was to spend some $36 million of the bond proceeds to develop the Project's rail and washing facilities to generate cash flow while building out a rare earth element processing facility and then mining coal.

23.     Borrower WC Coal's Limited Offering Memorandum further described its parent, American Resources Corporation, as having "subsidiaries" ReElement Technologies Corporation and American Carbon Corporation (i.e., the guarantor now known as American Infrastructure

Corporation) with Borrower WC Coal, Knott County Coal LLC, and McCoy Elkhorn Coal LLC all under the same common ownership, as shown in Borrower WC Coal's own organizational chart:



(*Id.* at A-4.)

24.     Borrower WC Coal's May 31, 2023 Limited Offering Memorandum noted that Borrower WC Coal's "Management Team will be the same team as the Parent," American Resources Corporation. (*Id.* at A-9.)

25.     As an example, in a June 2023 license agreement styled as between Borrower WC Coal and ReElement Technologies Corporation, the exact same contact information is provided for each party, and the shared executives are obvious from the signatures, as shown below:

CONTACT INFORMATION FOR LICENSOR:

ReElement Technologies LLC
12115 Visionary Way, Suite 174
PO Box 606
Fishers, IN 46038
Attention: General Counsel
email: gqj@americanresourcescorp.com


CONTACT INFORMATION FOR LICENSEE:

Wyoming County Coal LLC
12115 Visionary Way, Suite 174
PO Box 606
Fishers, IN 46038
Attention: General Counsel
email: gqj@americanresourcescorp.com

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives.

**LICENSOR:**

**REELEMENT TECHNOLOGIES LLC**

By: _____

Name: Thomas Sauve

Title: President

**LICENSEE:**

**WYOMING COUNTY COAL LLC**

By: _____

Name: Mark Jensen

Title: Chief Executive Officer

26.     On or about June 1, 2023, Borrower WC Coal's parent, American Resources Corporation, issued a press release titled "American Resources Corporation's Integrated Rare Earth, Critical Element and Metallurgical Carbon Processing Facility Signs Bond Purchase Agreement for $45,000,000," which announced the jobs that Borrower WC Coal's Project would supposedly bring to West Virginia's workers. In the press release, an executive director of the Wyoming County Economic Development Authority likewise discussed the anticipated jobs for West Virginia workers: "This project ensures Wyoming County, and this region of West Virginia

are not left behind during the electrification economy transition. Our county has a tremendous and proud workforce of men and women who are willing and able to meet the needs of the global infrastructure market." American Resources Corporation's press release discussed Borrower WC Coal's related entity, ReElement Technologies Corporation, and quoted "Kirk Taylor, CFO of American Resources Corporation," in part, as follows:

> To have achieved this important milestone for our Wyoming County complex and our ReElement Technologies division is a monumental moment for our Company and the industry. The state of West Virginia has been great to work with and has been very supportive of the development of our advanced carbon and critical mineral initiatives in the state. This funding enables us to efficiently modernize and transform the complex to be the first in the industry to process for both carbon and rare earth / critical battery mineral concentrates. The planned transformation will expand the footprint of the complex to incorporate higher efficiency carbon processing and logistics infrastructure, while also broadening its resource potential to capture and process critical and rare earth elements . . . We expect our Wyoming County complex to support well over 100 well-paying jobs in the region once fully reopened . . . .

27.     On or about June 9, 2023, Borrower WC Coal's corporate parent, American Resources Corporation, issued another press release titled "American Resources Corporation Announces Successful Closing of $45 Million West Virginia Economic Development Authority Solid Waste Disposal Facility Revenue Bond Issuance," which further touted the jobs that Borrower WC Coal's Project would purportedly provide for West Virginia's workers. American Resources Corporation's press release again cited Borrower WC Coal's related entity, ReElement Technologies Corporation, and quoted "Mark Jensen, Chairman and CEO of American Resources Corporation," in part, as follows:

> This is a monumental event for our business, which represents the largest financing we have closed to date, enabling the implementation of high value innovation around the critical and rare earth element marketplace. Once operational our technology around producing rare earth and critical mineral concentrates can be licensed out to third parties all throughout the world to cost effectively produce feedstock concentrates that can be refined at our ReElement refining facilities to produce battery and magnet grade feedstocks.

28.     Despite spending over $30 million in Bond proceeds to date, Borrower WC Coal has done nothing to advance these goals, while misrepresenting to the Trustee that the Project was nearly complete.

29.     In American Resources Corporation's 2023 Form 10-K Annual Report to the United States Securities and Exchange Commission concerning the Bonds, American Resources Corporation reported that it executed the Note and Loan Agreement itself (rather than Borrower WC Coal): "The Tax Exempt Bonds are payable solely from payments to be made by the Company (as that term is defined in American Resources Corporation's Fiscal Year 2023 form 10-K) under the Loan Agreement as evidenced by a Note from the Company to the Trustee." American Resources Corporation's 2023 Form 10-K Annual Report was signed by Mark C. Jensen as Chief Executive Officer/Chairman of the Board, Kirk P. Taylor as Chief Financial Officer, and Thomas M. Sauve as Director/President, each of whom has held nearly identical positions with Borrower WC Coal.

30.     In its 2023 Form 10-K Annual Report to the United States Securities and Exchange Commission, American Resources Corporation further conflated Borrower WC Coal with itself:

> The Company's obligations under the Loan Agreement are (i) except as otherwise described below, secured by first priority liens on and security interests in substantially all of the Company's and Subsidiary Guarantors' real property and other assets, subject to certain customary exceptions and permitted liens, and in any event excluding accounts receivable and inventory; and (ii) jointly and severally guaranteed by the Subsidiary Guarantors, subject to customary exceptions.

31.     Upon information and belief, and at all relevant times herein:

a.      The Defendants—Borrower WC Coal, Guarantor American Infrastructure Corporation, American Resources Corporation, Knott County Coal LLC, Land Betterment Corporation, ReElement Technologies Corporation, and

McCoy Elkhorn Coal LLC—shared common directors, officers, or persons in control and a shared corporate address.

b.    Each of the Defendants—Borrower WC Coal, Guarantor American Infrastructure Corporation, Knott County Coal LLC, Land Betterment Corporation, ReElement Technologies Corporation, and McCoy Elkhorn Coal LLC—was part of the same family of corporate entities, all under the ownership or control of the same corporate parent, American Resources Corporation.

c.    American Resources Corporation publicly refers to its subsidiaries, the other Defendants, as its business segments and states that it conducts its business through these Defendant subsidiaries.

d.    American Resources Corporation manages its operations through its subsidiaries, the other Defendants.

32.    At all relevant times, American Resources Corporation owned, operated, and controlled the other Defendants as if they were mere departments within or extensions of American Resources Corporation, and American Resources Corporation was and is the alter ego of the other Defendants, including Borrower WC Coal.

33.    At all relevant times, each of the Defendants—Borrower WC Coal, Guarantor American Infrastructure Corporation, Knott County Coal LLC, Land Betterment Corporation, ReElement Technologies Corporation, and McCoy Elkhorn Coal LLC—acted for and on behalf of American Resources Corporation and each other, and each of the Defendants is responsible for the acts and conduct of each of the other Defendants the same as if any one of them committed those acts.

34.    At all relevant times, American Resources Corporation was acting for and on its own behalf, by and through its agents, servants, and employees, and by and through each of the other Defendants, including Borrower WC Coal.

**B.    The Loan Transaction**

35.    The Trustee is the trustee under an Indenture of Trust dated June 1, 2023 (the "Indenture"), by and between the West Virginia Economic Development Authority and UMB Bank, N.A. A true and correct copy of the Indenture is attached as **Exhibit B**.[2]

36.    Under Article 15, Section 1 *et seq.* of Chapter 31 of the West Virginia Code, as amended (the "Act"), the West Virginia Economic Development Authority is authorized to issue revenue bonds and to use the proceeds from the sale thereof to finance in whole or in part the cost of the acquisition, construction and installation of facilities comprising "solid waste disposal facilities" within the meaning of 26 U.S.C. § 142(a)(6) and 26 C.F.R. § 1.142(a)(6)-1(b).

37.    As authorized by the Act, the West Virginia Economic Development Authority issued the Bonds to Borrower WC Coal to finance a portion of the cost of the acquisition, construction, and installation of a solid waste disposal facility located in Wyoming County, West Virginia, legally described in Exhibit A to the Loan Agreement (as defined below) (the "Project"), as well as to pay interest and other fees related to the issuance of the Bonds.

38.    On or about June 8, 2023, the West Virginia Economic Development Authority loaned the proceeds of the Bonds to Borrower WC Coal in the original principal amount of $45,000,000 (the "Loan").

39.    The Loan is evidenced by, among other things, a Loan Agreement by and among Borrower WC Coal and the West Virginia Economic Development Authority dated June 1, 2023

---

[2] All Capitalized Terms not otherwise defined in the complaint shall have the meaning given to them in the Indenture and Loan Agreement.

(the "<u>Loan Agreement</u>"). A true and correct copy of the Loan Agreement is attached hereto as **Exhibit C**.

40.    The Loan Agreement was assigned from the West Virginia Economic Development Authority to the Trustee by the Assignment of Rights Under the Loan Agreement (the "<u>Loan Agreement Assignment</u>"). A true and correct copy of the Loan Agreement Assignment is attached hereto as **Exhibit D**.

41.    To evidence the payment obligations and as additional security for the payment of the principal amount of and interest on the Bonds, Borrower WC Coal delivered the Promissory Note dated June 8, 2023 (the "<u>Note</u>") to the West Virginia Economic Development Authority. Simultaneously with the execution of the Note, the Note was assigned to the Trustee by allonges securely affixed to the Note. A true and correct copy of the Note with allonges is attached hereto as **Exhibit E**.

42.    Borrower WC Coal's obligations under the Loan Agreement are secured by, among other things, the Fee Deed of Trust, Security Agreement, Assignment of Rents and Leases, Financing Statement, Fixture Filing and As-Extracted Collateral Filing (West Virginia) dated June 6, 2023 (the "<u>Deed of Trust</u>"), by and from Borrower WC Coal to Michelle E. Wooton and Ryan Combs, as trustees (the "<u>Deed Trustees</u>") in favor of the Trustee. The Deed of Trust was recorded on June 8, 2023, as Instrument Number 229880 with the Clerk of Wyoming County, West Virginia in Deed Book 301 at Page 278. A true and correct copy of the Deed of Trust is attached hereto as **Exhibit F**.

43.    Borrower WC Coal's obligations under the Loan agreement are further secured by the Security Agreement dated June 1, 2023 (the "<u>Security Agreement</u>"). A true and correct copy of the Security Agreement is attached hereto as **Exhibit G**.

44.     Borrower WC Coal's obligations under the Loan Agreement are additionally secured by the Assignment of Sublicense Agreement, dated June 8, 2023 (the "Sublicense Assignment"), by and between Borrower WC Coal and the Trustee granting the Trustee a secured interest and right to use intellectual property owned by the Licensee (as defined below). A true and correct copy of the Sublicense Assignment is attached hereto as **Exhibit H**.

45.     The Sublicense Assignment was consented to by Ohio University (the "Licensee") in the Consent and Agreement to Collateral Assignment dated June 8, 2023 (the "Collateral Assignment Agreement"), by and among the Licensee, the Trustee, and Guarantor American Infrastructure Corporation. A true and correct copy of the Collateral Assignment Agreement is attached hereto as **Exhibit I**.

46.     Borrower WC Coal's obligations under the Loan Agreement are also secured by the Assignment of Contracts dated June 8, 2023 (the "Assignment of Contracts"), by and between Borrower WC Coal and the Trustee, granting the Trustee a secured interest and rights under certain contracts in an Event of Default. A true and correct copy of the Assignment of Contracts is attached hereto as **Exhibit J**.

47.     The Trustee's secured interest in the Property, Fixtures, Equipment, As-Extracted Collateral, and Personal Property listed on the Security Agreement is also evidenced by a UCC Financing Statement in favor of the Trustee, filed with the Indiana Secretary of State on or about June 9, 2023, as Doc. No. 202306133076138, and by a UCC Financing Statement filed with the West Virginia Secretary of State on or about June 9, 2023, as Doc. No. 2023E060900039 (collectively, "Borrower WC Coal's UCC Financing Statements"). True and correct copies of Borrower WC Coal's UCC Financing Statements are attached hereto as **Exhibit K**.

48.     The Indenture, the Note, Loan Agreement, Deed of Trust, security documents, loan documents and instruments concerning the Loan, in their original form and as amended and assigned, are collectively referred to as the "Bond Documents."

49.     Borrower WC Coal's repayment of the Loan is guaranteed by Guarantor American Infrastructure Corporation pursuant to that the Guaranty Agreement dated June 1, 2023 (the "Guaranty"), by and between the Trustee and Guarantor American Infrastructure Corporation. A true and correct copy of the Guaranty is attached hereto as **Exhibit L**.

50.     Pursuant to § 2 of the Guaranty, Guarantor American Infrastructure Corporation promised to "pay and perform all such Guarantied Obligations immediately upon demand therefor by the Trustee[.]"

51.     "Guarantied Obligations" is defined to mean in relevant part, "the full and punctual payment and performance when due . . . of all obligations, liabilities, and indebtedness . . . of the Borrower [WC Coal] to the Trustee."

52.     The Debt is further secured by the Membership Interest Pledge Agreement, dated June 8, 2023 (the "Membership Pledge"), by and between Guarantor American Infrastructure Corporation and the Trustee. A true and correct copy of the Membership Pledge is attached hereto as **Exhibit M**.

53.     In the Membership Pledge, Guarantor American Infrastructure Corporation, the sole member of Borrower WC Coal, pledged 100% of its shares in Borrower WC Coal to secure repayment of the Loan.

54.     The Trustee's secured interest in the shares of Borrower WC Coal is also evidenced by a UCC Financing Statement in favor of the Trustee, filed with the Indiana Secretary of State on or about June 9, 2023, as Doc. No. 202306123075972, as amended by a UCC-3 financing

statement updating Guarantor's name to "American Infrastructure Corporation" on October 1, 2025, filed as Doc. No. 202510013388515 (the "Guarantor UCC Financing Statement"). A true and correct copy of the Guarantor UCC Financing Statement is attached hereto as **Exhibit N**.

55.     The Trustee is the present owner and holder of the Note and the debt represented thereby, and the Trustee has a first lien security interest in the Property by virtue of the Deed of Trust, the Loan Agreement Assignment, the Security Agreement, and the allonges affixed to the Note.

**C.     Borrower WC Coal's Defaults Under the Loan Agreement**

56.     Borrower WC Coal has caused repeated Events of Default, as defined in § 9.1 of the Loan Agreement, which are continuing, as described below.

57.     Section 9.1(a) of the Loan Agreement provides that it shall be an Event of Default if Borrower WC Coal fails "to make any Loan Repayment on the day on which such Loan Repayment is due and payable."

58.     Section 4.1 of the Loan Agreement provides that on each Monthly Disbursement Date, Borrower WC Coal shall deposit the Loan Repayment into the Bond Fund in accordance with the Indenture.

59.     On or about June 3, 2025, Borrower WC Coal directed the Trustee to liquidate funds from the Debt Service Reserve Fund (created from the proceeds of the Bonds) in order to make the June 2025 Interest Payment (the "Protective Advance").

60.     Following the Protective Advance, Borrower WC Coal has failed to deposit its Loan Repayment. Such failure to timely make Loan Repayments is an Event of Default under § 9.1(a) of the Loan Agreement.

61.     Section 9.1(c) of the Loan Agreement provides that it shall be an Event of Default if Borrower WC Coal fails "to observe or perform any covenant, condition, agreement or provision

set forth in Sections . . . 6.4, [or] 6.7 . . . of this Loan Agreement on its part to be observed or performed."

62.    Section 6.4 of the Loan Agreement provides the financial and operational reporting requirements of Borrower WC Coal.

63.    Specifically, § 6.4(c) of the Loan Agreement requires Borrower WC Coal to provide Financial Reports to the Trustee.

64.    Section 6.4(c)(i) requires that Borrower WC Coal provide "Quarterly financial statements of Borrower WC Coal as soon as practicable after they are available, but in no event more than 45 days after the completion of such quarterly fiscal period."

65.    Section 6.4(c)(ii) requires that Borrower WC Coal provide a financial report certified by an Independent Accountant covering the operations of Borrower WC Coal for that Fiscal Year as soon as practicable after it is available, but in no event more than 150 days after the end of the Fiscal Year.

66.    Borrower WC Coal has caused a continuing Event of Default under the Loan Agreement pursuant to § 9.1(c) because Borrower WC Coal has failed to provide the Trustee with any quarterly or annual financial reports in the form required by §§ 6.4(c)(i) and (ii).

67.    Section 6.4(f) requires Borrower WC Coal to provide the trustee with an annual budget at least 60 days prior to the commencement of each Fiscal Year. The annual budget is required to be reviewed by the Independent Engineer.

68.    An additional Event of Default by Borrower WC Coal has occurred and is continuing pursuant to § 9.1(c) of the Loan Agreement because Borrower WC Coal has failed to provide any budget for the 2025 Fiscal Year.

69.     Next, § 6.7 of the Loan Agreement requires Borrower WC Coal to use its best efforts to set its prices so that the Project Revenues will enable Borrower WC Coal to pay the Operating Expenses of the Project.

70.     Borrower WC Coal has caused an event of default that is continuing under § 9.1(c) of the Loan Agreement because Borrower WC Coal has failed to operate the Project in a manner that enables Borrower WC Coal to pay the Operating Expenses of the Project out of the Project Revenues.

71.     Section 9.1(d) of the Loan Agreement provides that it shall be an Event of Default if, on the last day of the year, Borrower WC Coal fails to "maintain in each Fiscal Year (as conclusively evidenced by the calculation thereof set forth in Audited Financial Statements for such Fiscal Year) a Debt Service Coverage Ratio of at least 1.1x required by the provisions of 6.4(a)(iii) [of the Loan Agreement]."

72.     Borrower WC Coal has caused an Event of Default that is continuing under § 9.1(d) of the Loan Agreement because Borrower WC Coal has failed to maintain a Debt Service Coverage Ratio of 1.1x as required by the Loan Agreement for the 2025 Fiscal Year.

73.     Section 9.1(e) of the Loan Agreement provides that it shall be an Event of Default if on the last day of the year, Borrower WC Coal fails "to maintain in each Fiscal Year (as conclusively evidenced by the calculation thereof set forth in Audited Financial Statements for such Fiscal Year) Days' Cash on Hand of at least 45 days as required by the provisions of Section 6.4(b)(iii) [of the Loan Agreement]."

74.     Borrower WC Coal has caused an Event of Default that is continuing under § 9.1(e) of the Loan Agreement because Borrower WC Coal has failed to maintain at least 45 Days' Cash on Hand in the 2025 Fiscal Year.

75.    Section 9.1(m) of the Loan Agreement provides in turn, that if Borrower WC Coal "ceases to develop, construct, operate or maintain the Project," it shall be an Event of Default.

76.    Borrower WC Coal has failed to construct, maintain, or operate the project for more than 30 days constituting an additional and continuing Event of Default under the Loan Agreement.

**D.    Borrower WC Coal's Defaults Under the Indenture**

77.    Pursuant to § 6.5 of the Loan Agreement, "Borrower [WC Coal] . . . agrees to all terms and provisions of the Indenture and accepts each and every one of its duties and obligations expressed thereunder and agrees to comply with and adhere to all restrictions and limitations imposed on the Borrower [WC Coal] thereunder."

78.    Section 6.01(a) of the Indenture provides that it shall be an Event of Default if there is "default in the due and punctual payment of the principal of any Bond when and as the same shall become due and payable, whether at maturity as therein expressed, by proceedings for redemption or acceleration or otherwise[.]"

79.    Borrower WC Coal's failure to timely make Loan Repayments toward the principal of the Bonds in accordance with the terms of the Loan Agreement following the Protective Advance is an Event of Default under § 6.01(a) of the Indenture.

80.    This Event of Default under the Indenture constitutes a cross-default under the Loan Agreement Pursuant to § 9.1(l) of the Loan Agreement.

81.    Section 6.01(d) of the Indenture further provides that it shall be an Event of Default under the Indenture if an Event of Default occurs under the Loan Agreement or any of the other Security Documents.

82.    As detailed above, Borrower WC Coal has defaulted under multiple provisions of the Loan Agreement, constituting an additional Event of Default under the Indenture.

83.     The Trustee sent a Notice of Default to Borrower WC Coal and Guarantor American Infrastructure Corporation on or around August 19, 2025, enumerating the above-identified Events of Default under the Loan Agreement and Indenture. A true and correct copy of the Notice of Default is attached as **Exhibit O**.

**E.      Borrower WC Coal's Default Under the Deed of Trust**

84.     Section 1.2(a) of the Deed of Trust defines an "Actionable Default" as: "[A]n Event of Default under the Loan Agreement."

85.     As detailed above, Borrower WC Coal has defaulted under multiple provisions of the Loan Agreement, constituting an Actionable Default under the Deed of Trust.

**F.      The Trustee's Damages and Remedies Under the Loan Documents**

86.     The Trustee has performed all conditions, covenants, and obligations on its part to be performed pursuant to the Bond Documents.

87.     The Trustee sent a Demand Letter to Borrower WC Coal and Guarantor American Infrastructure Corporation on around November 12, 2025, demanding prompt payment of the past due amounts and to inspect the books and records of the Project pursuant to the above enumerated Events of Default. A true and correct copy of the Demand Letter is attached as **Exhibit P**.

88.     As of November 15, 2025, the amount due and owing by Borrower WC Coal under the Loan Agreement and Deed of Trust is $45,000,000, together with accrued interest of $1,845,000.00, plus accruing interest at $11,250.00 per diem thereafter, together with fees, charges, and costs recoverable under the Bond Documents, without defense, deduction, offset, recoupment, or counterclaim.

89.     On December 12, 2025, the Trustee provided a Notice of Acceleration to Borrower WC Coal and Guarantor American Infrastructure Corporation pursuant to § 6.02 of the Indenture,

§ 9.2(a) of the Loan Agreement, and § 5.1(a) of the Deed of Trust. A true and correct copy of the Notice of Acceleration is attached as **Exhibit Q**.

90.    Section 5.1(f) of the Deed of Trust provides the Trustee the ability to move the Court for the appointment of a Receiver in the case of an Actionable Default.

91.    Under the terms of the Loan Agreement and Deed of Trust, as assigned, and under West Virginia law, the Trustee is entitled to the remedy of the appointment of a receiver to take possession of and protect the Property (and Fixtures, Equipment, As-Extracted Collateral, and Personal Property), to manage and operate the same, and to collect the Rents and any other income generated therefrom.

## G.    Defendants' Misrepresentations about the Project to the Trustee and Other Parties

92.    Throughout the life of the Bonds, Borrower WC Coal, Guarantor American Infrastructure Corporation, and their parent, American Resources Corporation, have provided misleading and deceptive information to the Trustee and to other parties regarding the Project's progress and financial status.

### i.    Borrower WC Coal's parent, American Resources Corporation, made misleading and deceptive statements about the Project's status and use of the Bond Proceeds.

93.    On or about May 22, 2024, Borrower WC Coal's parent, American Resources Corporation, held an earnings call for investors, analysts, and other interested parties to discuss its First Quarter 2024 financial results. During that call, Mark Jensen, American Resources Corporation's Chairman and Chief Executive Officer, was joined by Chief Financial Officer Kirk Taylor and President Tom Sauve. Mark Jensen said the following about the Project in West Virginia:

> [W]e try to be as transparent as we can with our public communication. From a corporate level, I couldn't be more pleased with the positioning of our various

divisions and the efforts that our team is putting forth in this transitionary period of time as you recall our strategic committee from our board headset a game plan of spinning off the various divisions . . . . Quickly, I'll dive into American Carbon. American Carbon, as I mentioned, owns the permits around the mining operation. We are very quickly in the midst of spinning that division off and distributing those shares to our underlying investors with the goal of ramping up those operations, predominantly focused on Wyoming County Coal, significant development taking place there from an equipment perspective and from a face-up perspective, being on leash there to finish that face-up, to put the mine into production, and then also the equipment that we've been procuring for that operation and rebuilding that equipment and staging that equipment that we can be delivering into Wyoming very shortly.

94.    In addition, during the May 22, 2024 earnings call, Mark Jensen provided the following responses to questions about the Project:

**Caller**: Hey, American Carbon at the Wyoming County Coal Project there. You've got this $45 million tax exempt bond that funds some of your expenditures. Any idea of how much of these funds have been spent?

**Mark Jensen**: Yes, so roughly around $20 million of them have been spent to-date. And so that's buying the equipment, developing the property, positioning the prep plant, securing additional components to expand that prep plant. So we have quite a bit of liquidity still on that project.

**Caller**: Okay. And conceptually, how should we expect the spending of the other $25 million?

**Mark Jensen**: Yes, so here in the next few months, finishing the development of it and then putting the mine into production. So our goal, and I'm just being transparent, I mean, Wyoming is a different beast with the taxes on bond it's focused in getting that in production as soon as possible working through some nuances around the permits and some new regulations that came in around permits of salamanders, which is a new thing for us. The -- in the streams around there, which we don't have, so it's a good thing for us. But Wyoming is focused on going into production as soon as possible. We've been focusing on getting American Carbons spun out before we ramp up the balance of the carbon operation. So in the meantime, we've been doing a lot of development and cost reductions, reducing bonds outstanding, positioning the assets, focusing on the most highest value assets as we bring these back on post-spin out.

95.    American Resources Corporation's assertions that it had spent approximately $20 million of the Bond proceeds as of the May 22, 2024 earnings call are false and misleading. In

fact, upon information and belief, Borrower WC Coal has spent only a small fraction of the $45 million in Bond proceeds at the Project.

96.     On or about October 22, 2025, the Trustee visited the Project site in Wyoming County, West Virginia, which revealed that—notwithstanding prior misrepresentations to the Trustee and to other parties—Borrower WC Coal has done little, if anything, to complete any work at the Project site, much less to create a "'best-in-class' processing and logistics hub," as it promised to do. In fact, the dilapidated facilities are in a worse state now than when the Bonds were issued, as shown by the photo below, taken in October 2025:



97.     Rather than purchase equipment or develop the property as Borrower WC Coal falsely claimed to have done, the rusted-out facilities at the Project site remain inoperable and even lack access to power, as these October 2025 images from the Trustee's visit further reveal:



**ii.**    **Borrower WC Coal repeatedly submitted misleading and deceptive Project Reports to the Trustee.**

98.    Borrower WC Coal provided the Trustee with monthly and quarterly project reports (respectively, the "<u>Monthly Project Reports</u>" and "<u>Quarterly Project Reports</u>") from June 2023 through June 2025 in which Borrower WC Coal repeatedly misled the Trustee about the Project's supposed progress or otherwise supplied the Trustee with false information and bogus excuses for Project delays.

99.    Borrower WC Coal provided the Trustee with monthly Project Reports for June 2023 through December 2023, which claimed Borrower WC Coal had supposedly completed increasing percentages of work toward the Project. As of December 31, 2023, Borrower WC Coal professed to the Trustee that the "Project financed with proceeds of the Bonds" was supposedly "26.0% completed" and that Borrower WC Coal has already spent $9,492,165.35 of the Bond proceeds. Instead, Borrower WC Coal's "completion" reports were expenditure reports, as $9,492,165.35 is 26.0% of the $36,459,135.00 dedicated to the Project Account.

100.    Borrower WC Coal's 2023 Project Reports to the Trustee are false. Borrower WC Coal has done little, if any, work at the Project. Borrower WC Coal has not completed 26% of the Project. Moreover, Borrower WC Coal's 2023 Project Reports to the Trustee are contradicted by contemporaneous disclosures about the Project from Borrower WC Coal's parent, American Resources Corporation, in its 2023 Form 10-K Annual Report to the United States Securities and Exchange Commission. Specifically, Borrower WC Coal claimed to the Trustee that the Project was supposedly 26% completed by December 31, 2023, but its corporate parent disclosed to the United States Securities and Exchange Commission that "no work had been performed at the facility" as of December 31, 2023:

> "The Company acquired the Pioneer Preparation Plant as an idled facility, and since acquisition, no work has been performed at the facility. Both the Pioneer Preparation Plant and the rail loadout are idled and would require an undetermined amount of work and capital to bring them into operation, which is currently in the initial phases of planning and no cost estimates have been received."

101.    Borrower WC Coal's false and intentionally misleading Project Reports continued throughout 2024. In a Revised Monthly Project Report for January 31, 2024—signed by Borrower WC Coal's Chief Financial Officer, Kirk Taylor—Borrower WC Coal claimed the Project was 36.9% completed, with $13,446,665.35 of the proceeds of the Bonds spent as of January 31, 2024 (once again reporting completion where 36.9% instead reflects expenditure of the $36,459,135 Project Account). Borrower WC Coal's Revised January 31, 2024 Monthly Project Report is false. Borrower WC Coal has done little, if any, work at the Project and has not completed 36.9% of the Project.

102.    Next, in a Monthly Project Report for March 31, 2024 (again signed by Borrower WC Coal's Chief Financial Officer, Kirk Taylor), Borrower WC Coal claimed that the Project was 51.2% completed, with $18,650,490.35 of the proceeds of the Bonds spent as of March 31, 2024

(yet again reporting expenditure, not actual completion). Borrower WC Coal also claimed as follows:

> The Company was made aware of a need to have an environmental review of the property upon which the Project is located to determine if any evidence of inhabitation by the Red Backed Salamander, an endangered species, was present. Construction of the Project was temporarily halted until this review was completed. This delay will result in the project being completed in December 2024 rather than September 2024.

103.    Borrower WC Coal's March 31, 2024 Monthly Project Report is false. Borrower WC Coal has done little, if any, work at the Project and has not completed 51.2% of the Project. Borrower WC Coal's excuse for a purported "delay" due to salamanders is additionally false and misleading since, upon information and belief, the Red-backed Salamander is an abundant species that is not classified as endangered. *See* "List of Endangered and Threatened Wildlife," 50 C.F.R. § 17.11 (https://www.ecfr.gov/current/title-50/chapter-I/subchapter-B/part-17/subpart-B/section-17.11), which does not contain the Red-backed Salamander; *see also* Thomas K. Pauley, *Salamanders of West Virginia*, (West Virginia Division of Natural Resources, Wildlife Resources Section 2021) ("Eastern Red-backed Salamander (*Plethodon cinereus*) – These small, slender salamanders are the most common woodland salamanders in West Virginia."). Borrower WC Coal has refused to provide any information to support its contentions in this report about supposed project delays caused by environmental reviews for salamanders.

104.    In a Monthly Project Report for April 30, 2024, signed by Borrower WC Coal's Chief Financial Officer, Kirk Taylor, Borrower WC Coal claimed that the Project was 53.7% completed, with $19,560,738.35 of the proceeds of the Bonds spent as of April 30, 2024 (following the simple expenditure reporting trend rather than actual completion). Borrower WC Coal again claimed as follows:

> The Company was made aware of a need to have an environmental review of the property upon which the Project is located to determine if any evidence of

inhabitation by the Red Backed Salamander, an endangered species, was present. Construction of the Project was temporarily halted until this review was completed. This delay will result in the project being completed in December 2024 rather than September 2024.

105.    Borrower WC Coal's April 30, 2024 Monthly Project Report is false. Borrower WC Coal has done little, if any, work at the Project and has not completed 53.7% of the Project. Borrower WC Coal's excuse for a purported "delay" due to salamanders is additionally false and misleading since, upon information and belief, the Red-backed Salamander is an abundant species that is not classified as endangered. Borrower WC Coal has refused to provide any information to support its contentions in this report about supposed project delays caused by environmental reviews for salamanders.

106.    In a Revised Monthly Project Report for May 31, 2024, signed by Borrower WC Coal's Chief Financial Officer, Kirk Taylor, Borrower WC Coal claimed that the Project was 59.4% completed, with $22,428,278.35 of the proceeds of the Bonds spent as of May 31, 2024 (again reporting just expenditure percentage, not work completion). Borrower WC Coal again claimed as follows:

> The Company was made aware of a need to have an environmental review of the property upon which the Project is located to determine if any evidence of inhabitation by the Red Backed Salamander, an endangered species, was present. Construction of the Project was temporarily halted until this review was completed. This delay will result in the project being completed in December 2024 rather than September 2024.

107.    Borrower WC Coal's May 31, 2024 Revised Monthly Project Report is false. Borrower WC Coal has done little, if any, work at the Project and has not completed 59.4% of the Project. Borrower WC Coal's excuse for a purported "delay" due to salamanders is additionally false and misleading since, upon information and belief, the Red-backed Salamander is an abundant species that is not classified as endangered. Borrower WC Coal has refused to provide

any information to support its contentions in this report about supposed project delays caused by environmental reviews for salamanders.

108.    In a Revised Monthly Project Report for June 30, 2024, signed by Borrower WC Coal's Chief Financial Officer, Kirk Taylor, Borrower WC Coal claimed that the Project was 63.2% completed, with $23,040,710.35 of the proceeds of the Bonds spent as of June 30, 2024 (doubling down on a report purely of how much money was moved out of the Project Account). Borrower WC Coal again claimed as follows:

> The Company was made aware of a need to have an environmental review of the property upon which the Project is located to determine if any evidence of inhabitation by the Red Backed Salamander, an endangered species, was present. Construction of the Project was temporarily halted until this review was completed. This delay will result in the project being completed in December 2024 rather than September 2024.

109.    Borrower WC Coal's Revised June 30, 2024 Monthly Project Report is false. Borrower WC Coal has done little, if any, work at the Project and has not completed 63.2% of the Project. Borrower WC Coal's excuse for a purported "delay" due to salamanders is additionally false and misleading since, upon information and belief, the Red-backed Salamander is an abundant species that is not classified as endangered. Borrower WC Coal has refused to provide any information to support its contentions in this report about supposed project delays caused by environmental reviews for salamanders.

110.    In a Revised Monthly Project Report for July 31, 2024, signed by Borrower WC Coal's Chief Financial Officer, Kirk Taylor, Borrower WC Coal claimed that the Project was 73.4% completed, with $26,742,810.35 of the proceeds of the Bonds spent as of July 31, 2024. Borrower WC Coal again claimed as follows:

> The Company was made aware of a need to have an environmental review of the property upon which the Project is located to determine if any evidence of inhabitation by the Red Backed Salamander, an endangered species, was present. Construction of the Project was temporarily halted until this review was completed.

This delay will result in the project being completed in December 2024 rather than September 2024.

111.    Borrower WC Coal's Revised July 31, 2024 Monthly Project Report is not true. Borrower WC Coal has done little, if any, work at the Project and at no point has Borrower WC Coal completed 73.4% of the Project. Borrower WC Coal's excuse for a purported "delay" due to salamanders is additionally false and misleading since, upon information and belief, the Red-backed Salamander is an abundant species that is not classified as endangered. Borrower WC Coal has refused to provide any information to support its contentions in this report about supposed project delays caused by environmental reviews for salamanders.

112.    In a Monthly Project Report for August 31, 2024, signed by Borrower WC Coal's Chief Financial Officer, Kirk Taylor, Borrower WC Coal claimed that the Project was 77% completed, with $28,070,782.35 of the proceeds of the Bonds spent as of August 31, 2024. Borrower WC Coal provided a variation on its prior claims, as follows:

> The Company was made aware of a need to have an environmental review of the property upon which the Project is located to determine if any evidence of inhabitation by the Red Backed Salamander, an endangered species, was present. Construction of the Project was temporarily halted until this review was completed. The review was completed and no evidence of inhabitation by the Red Backed Salamander was found on the property. Construction of the Project was able to be renewed. This delay will result in the project being completed in December 2024 rather than September 2024.

113.    Borrower WC Coal's Revised August 31, 2024 Monthly Project Report is not true. Borrower WC Coal has done little, if any, work at the Project and at no point has Borrower WC Coal completed 77% of the Project. Borrower WC Coal's excuse for a purported "delay" due to salamanders is additionally false and misleading since, upon information and belief, the Red-backed Salamander is an abundant species that is not classified as endangered. Borrower WC Coal has refused to provide any information to support its contentions in this report about supposed project delays caused by environmental reviews for salamanders.

114.    In a Monthly Project Report for October 31, 2024, signed by Borrower WC Coal's Chief Financial Officer, Kirk Taylor, Borrower WC Coal claimed that the Project was 85.1% completed, with $31,036,351.23 of the proceeds of the Bonds spent as of October 31, 2024. Borrower WC Coal supplied the Trustee with the identical claim from the prior month:

> The Company was made aware of a need to have an environmental review of the property upon which the Project is located to determine if any evidence of inhabitation by the Red Backed Salamander, an endangered species, was present. Construction of the Project was temporarily halted until this review was completed. The review was completed and no evidence of inhabitation by the Red Backed Salamander was found on the property. Construction of the Project was able to be renewed. This delay will result in the project being completed in December 2024 rather than September 2024.

115.    Borrower WC Coal's October 31, 2024 Monthly Project Report is false. Borrower WC Coal has done little, if any, work at the Project and has not completed 85.1% of the Project. Borrower WC Coal's excuse for a purported "delay" due to salamanders is additionally false and misleading since, upon information and belief, the Red-backed Salamander is an abundant species that is not classified as endangered. Borrower WC Coal has refused to provide any information to support its contentions in this report about supposed project delays caused by environmental reviews for salamanders.

116.    In a Monthly Project Report for November 30, 2024, signed by Borrower WC Coal's Chief Financial Officer, Kirk Taylor, Borrower WC Coal claimed that the Project was 85.7% completed, with $31,242,709.23 of the proceeds of the Bonds spent as of November 30, 2024. Borrower WC Coal supplied the Trustee with the identical claim from the prior two months:

> The Company was made aware of a need to have an environmental review of the property upon which the Project is located to determine if any evidence of inhabitation by the Red Backed Salamander, an endangered species, was present. Construction of the Project was temporarily halted until this review was completed. The review was completed and no evidence of inhabitation by the Red Backed Salamander was found on the property. Construction of the Project was able to be renewed. This delay will result in the project being completed in December 2024 rather than September 2024.

117.    Borrower WC Coal's November 30, 2024 Monthly Project Report is false. Borrower WC Coal has done little, if any, work at the Project and has not completed 85.7% of the Project. Borrower WC Coal's excuse for a purported "delay" due to salamanders is additionally false and misleading since, upon information and belief, the Red-backed Salamander is an abundant species that is not classified as endangered. Borrower WC Coal has refused to provide any information to support its contentions in this report about supposed project delays caused by environmental reviews for salamanders.

118.    In a Monthly Project Report for December 31, 2024, signed by Borrower WC Coal's Chief Financial Officer, Kirk Taylor, Borrower WC Coal falsely claimed that the Project was 87.4% completed, with $31,855,141.23 of the proceeds of the Bonds spent as of December 31, 2024. Borrower WC Coal also claimed that the "[o]perations for the project financed with proceeds of the Bonds commenced during December 2024." Borrower WC Coal supplied the Trustee with the identical claim from the prior three months:

> The Company was made aware of a need to have an environmental review of the property upon which the Project is located to determine if any evidence of inhabitation by the Red Backed Salamander, an endangered species, was present. Construction of the Project was temporarily halted until this review was completed. The review was completed and no evidence of inhabitation by the Red Backed Salamander was found on the property. Construction of the Project was able to be renewed. This delay will result in the project being completed in December 2024 rather than September 2024.

119.    Borrower WC Coal's December 31, 2024 Monthly Project Report is false. Borrower WC Coal has done little, if any, work at the Project and has not completed 87.4% of the Project. Borrower WC Coal's excuse for a purported "delay" due to salamanders is additionally false and misleading since, upon information and belief, the Red-backed Salamander is an abundant species that is not classified as endangered. Borrower WC Coal has refused to provide

any information to support its contentions in this report about supposed project delays caused by environmental reviews for salamanders.

120.    In a Monthly Project Report for January 31, 2025, signed by Borrower WC Coal's Chief Financial Officer, Kirk Taylor, Borrower WC Coal falsely claimed that the Project was 87.4% completed, with $33,529,256.23 of the proceeds of the Bonds spent as of January 31, 2025. Borrower WC Coal also claimed that the "[o]perations for the project financed with proceeds of the Bonds commenced during December 2024." Borrower WC Coal supplied the Trustee with the identical claim from the prior four months:

> The Company was made aware of a need to have an environmental review of the property upon which the Project is located to determine if any evidence of inhabitation by the Red Backed Salamander, an endangered species, was present. Construction of the Project was temporarily halted until this review was completed. The review was completed and no evidence of inhabitation by the Red Backed Salamander was found on the property. Construction of the Project was able to be renewed. This delay will result in the project being completed in December 2024 rather than September 2024.

121.    Borrower WC Coal's January 31, 2025 Monthly Project Report is false. Borrower WC Coal has done little, if any, work at the Project and has not completed 87.4% of the Project. Borrower WC Coal's excuse for a purported "delay" due to salamanders is additionally false and misleading since, upon information and belief, the Red-backed Salamander is an abundant species that is not classified as endangered. Borrower WC Coal has refused to provide any information to support its contentions in this report about supposed project delays caused by environmental reviews for salamanders. Further, as of the date of this report, Borrower WC Coal's representation that the Project "will" be complete in Dec. 2024 was nonsensical, as that date was already in the past.

122.    In a Monthly Project Report for February 28, 2025, signed by Borrower WC Coal's Chief Financial Officer, Kirk Taylor, Borrower WC Coal falsely claimed that the Project was

92.0% completed, with $33,529,256.23 of the proceeds of the Bonds spent as of February 28, 2025. Borrower WC Coal also claimed that the "[o]perations for the project financed with proceeds of the Bonds commenced during December 2024." Borrower WC Coal supplied the Trustee with the identical claim from the prior five months:

> The Company was made aware of a need to have an environmental review of the property upon which the Project is located to determine if any evidence of inhabitation by the Red Backed Salamander, an endangered species, was present. Construction of the Project was temporarily halted until this review was completed. The review was completed and no evidence of inhabitation by the Red Backed Salamander was found on the property. Construction of the Project was able to be renewed. This delay will result in the project being completed in December 2024 rather than September 2024.

123.    Borrower WC Coal's February 28, 2025 Monthly Project Report is false. Borrower WC Coal has done little, if any, work at the Project and has not completed 92.0% of the Project. Borrower WC Coal's excuse for a purported "delay" due to salamanders is additionally false and misleading since, upon information and belief, the Red-backed Salamander is an abundant species that is not classified as endangered. Borrower WC Coal has refused to provide any information to support its contentions in this report about supposed project delays caused by environmental reviews for salamanders. Further, as of the date of this report, Borrower WC Coal's representation that the Project "will" be complete in Dec. 2024 was nonsensical, as that date was already in the past.

124.    In a Monthly Project Report for March 31, 2025, signed by Borrower WC Coal's Chief Financial Officer, Kirk Taylor, Borrower WC Coal falsely claimed that the Project was 92.0% completed, with $33,529,256.23 of the proceeds of the Bonds spent as of March 31, 2025. Borrower WC Coal also claimed that the "[o]perations for the project financed with proceeds of the Bonds commenced during December 2024." Borrower WC Coal supplied the Trustee with the identical claim from the prior six months:

The Company was made aware of a need to have an environmental review of the property upon which the Project is located to determine if any evidence of inhabitation by the Red Backed Salamander, an endangered species, was present. Construction of the Project was temporarily halted until this review was completed. The review was completed and no evidence of inhabitation by the Red Backed Salamander was found on the property. Construction of the Project was able to be renewed. This delay will result in the project being completed in December 2024 rather than September 2024.

125.    Borrower WC Coal's March 31, 2025 Monthly Project Report is not true. Borrower WC Coal has done little, if any, work at the Project and has not completed 92.0% of the Project. Borrower WC Coal's excuse for a purported "delay" due to salamanders is additionally false and misleading since, upon information and belief, the Red-backed Salamander is an abundant species that is not classified as endangered. Borrower WC Coal has refused to provide any information to support its contentions in this report about supposed project delays caused by environmental reviews for salamanders. Further, as of the date of this report, Borrower WC Coal's representation that the Project "will" be complete in Dec. 2024 was nonsensical, as that date was already in the past.

126.    In a Monthly Project Report for April 30, 2025, signed by Borrower WC Coal's Chief Financial Officer, Kirk Taylor, Borrower WC Coal falsely claimed that the Project was 92.0% completed, with $33,529,256.23 of the proceeds of the Bonds spent as of March 31, 2025. Borrower WC Coal supplied the Trustee with the identical claim from the prior seven months:

The Company was made aware of a need to have an environmental review of the property upon which the Project is located to determine if any evidence of inhabitation by the Red Backed Salamander, an endangered species, was present. Construction of the Project was temporarily halted until this review was completed. The review was completed and no evidence of inhabitation by the Red Backed Salamander was found on the property. Construction of the Project was able to be renewed. This delay will result in the project being completed in December 2024 rather than September 2024.

127.    Borrower WC Coal's April 30, 2025 Monthly Project Report is false. Borrower WC Coal has done little, if any, work at the Project and has not completed 92.0% of the Project.

Borrower WC Coal's excuse for a purported "delay" due to salamanders is additionally false and misleading since, upon information and belief, the Red-backed Salamander is an abundant species that is not classified as endangered. Borrower WC Coal has refused to provide any information to support its contentions in this report about supposed project delays caused by environmental reviews for salamanders. Further, as of the date of this report, Borrower WC Coal's representation that the Project "will" be complete in Dec. 2024 was nonsensical, as that date was already in the past.

128.     In a Monthly Project Report for May 31, 2025, signed by Borrower WC Coal's Chief Financial Officer, Kirk Taylor, Borrower WC Coal falsely claimed that the Project was 92.0% completed, with $33,529,256.23 of the proceeds of the Bonds spent as of May 31, 2025. Borrower WC Coal supplied the Trustee with a nearly identical claim as those from the prior eight months:

> The Company was made aware of a need to have an environmental review of the property upon which the Project is located to determine if any evidence of inhabitation by the Red Backed Salamander, an endangered species, was present. Construction of the Project was temporarily halted until this review was completed. The review was completed and no evidence of inhabitation by the Red Backed Salamander was found on the property. Construction of the Project was able to be resumed including expanded permit work on collection of tailings for rare earth mineral extraction.

129.     Borrower WC Coal's May 31, 2025 Monthly Project Report is false. Borrower WC Coal has done little, if any, work at the Project and has not completed 92.0% of the Project. Borrower WC Coal's excuse for a purported "delay" due to salamanders is additionally false and misleading since, upon information and belief, the Red-backed Salamander is an abundant species that is not classified as endangered. Borrower WC Coal has refused to provide any information to support its contentions in this report about supposed project delays caused by environmental reviews for salamanders.

130.    In a Monthly Project Report for "Jume" [sic] 30, 2025, signed by Borrower WC Coal's Chief Financial Officer, Kirk Taylor, Borrower WC Coal falsely claimed that the Project was 92.0% completed, with $33,529,256.23 of the proceeds of the Bonds spent as of June 30, 2025. Borrower WC Coal supplied the Trustee with a nearly identical claim as those from the prior nine months:

> The Company was made aware of a need to have an environmental review of the property upon which the Project is located to determine if any evidence of inhabitation by the Red Backed Salamander, an endangered species, was present. Construction of the Project was temporarily halted until this review was completed. The review was completed and no evidence of inhabitation by the Red Backed Salamander was found on the property. Construction of the Project was able to be resumed including expanded permit work on collection of tailings for rare earth mineral extraction.

131.    Borrower WC Coal's June 30, 2025 Monthly Project Report is false. Borrower WC Coal has done little, if any, work at the Project and has not completed 92.0% of the Project. Borrower WC Coal's excuse for a purported "delay" due to salamanders is additionally false and misleading since, upon information and belief, the Red-backed Salamander is an abundant species that is not classified as endangered. Borrower WC Coal has refused to provide any information to support its contentions in this report about supposed project delays caused by environmental reviews for salamanders.

### iii.    Borrower WC Coal repeatedly submitted misleading and deceptive disbursement requests to the Trustee.

132.    From 2023 through March 2025, Borrower WC Coal repeatedly submitted to the Trustee disbursement requests, also known as requisitions (as described below, the "Requisitions"), that were misleading and deceptive because they were not—despite Borrower WC Coal's misrepresentations to the contrary—for legitimate Project Costs (as defined below) for the Project in West Virginia. Instead, Borrower WC Coal submitted deceptive Requisitions to the Trustee to receive proceeds of the Bonds to which Borrower WC Coal was not actually entitled.

Under the guise of these Requisitions to the Trustee, Borrower WC Coal surreptitiously misappropriated proceeds of the Bonds to its related entities, namely defendants Land Betterment Corporation, McCoy Elkhorn Coal LLC, Knott County Coal LLC, ReElement Technologies Corporation, as well as to their collective parent, American Resources Corporation.

133.    Section 1.01 of the Indenture defines Project Costs to mean:

[T]he cost of developing, designing, engineering, equipping, procuring, constructing, starting up, commissioning, acquiring and testing of the Project and all related infrastructure as set forth in the Project Budget, including (a) amounts payable pursuant to the Project Budget; (b) the cost of acquiring any real property interests or rights in or to the property where the Project is located or otherwise necessary for the construction or operation of the Project; (c) real and personal property taxes, ad valorem taxes, sales, use and excise taxes (or payments in lieu thereof required under any tax abatement of similar arrangement) and insurance (including title insurance) premiums payable with respect to the Project during the construction and startup of the Project; (d) initial working capital requirements of the Project as set forth in the Project Budget; (e) the costs of acquiring permits for the Project; (f) interest and fees on the Series 2023 Bonds for a period from the Closing Date through December 31, 2024; (g) an owner's contingency; (h) financial, legal, consulting and rating agency fees, costs and expenses; (i) funding a reasonably required debt service reserve; and (j) other fees, costs and expenses relating to the development, procurement, construction, testing, commissioning and financing of the Project.

134.    On September 27, 2023, Borrower WC Coal submitted Requisition Certificate No. 3 to the Trustee in the total amount of $2,871,258.29 for the payment of purportedly legitimate and reimbursable Project Costs. Borrower WC Coal's Requisition was deceptive and misleading because it was not used to pay Project Costs. Instead, this Requisition included impermissible payments to Borrower WC Coal's related parties, Land Betterment Corporation and McCoy Elkhorn Coal LLC.

135.    On October 30, 2023, Borrower WC Coal submitted Requisition Certificate No. 4 to the Trustee in the total amount of $531,248.00 for the payment of purportedly legitimate and reimbursable Project Costs. Borrower WC Coal's Requisition was deceptive and misleading because it was not used to pay Project Costs.

136.    On November 20, 2023, Borrower WC Coal submitted Requisition Certificate No. 5 in the total amount of $533,915.06 for the payment of purportedly legitimate and reimbursable Project Costs. Borrower WC Coal's Requisition was deceptive and misleading because it was not used to pay Project Costs.

137.    On November 27, 2023, Borrower WC Coal submitted Requisition Certificate No. 6 in the total amount of $3,525,000.00 for the payment of purportedly legitimate and reimbursable Project Costs. Borrower WC Coal's Requisition was deceptive and misleading because it was not used to pay Project Costs. Instead, this Requisition included impermissible payments to Borrower WC Coal's related party, Knott County Coal LLC.

138.    On December 27, 2023, Borrower WC Coal submitted Requisition Certificate No. 7 in the total amount of $510,248.00, for the payment of purportedly legitimate and reimbursable Project Costs. Borrower WC Coal's Requisition was deceptive and misleading because it was not used to pay Project Costs. Instead, this Requisition included impermissible payments to Borrower WC Coal's related parties, American Resources Corporation and Land Betterment Corporation.

139.    On January 19,2024, Borrower WC Coal submitted Requisition Certificate No. 8 in the total amount of $3,954,500.00 for the payment of purportedly legitimate and reimbursable Project Costs. Borrower WC Coal's Requisition was deceptive and misleading because it was not used to pay Project Costs. Instead, this Requisition included impermissible payments to Borrower WC Coal's related parties, Knott County Coal LLC and McCoy Elkhorn Coal LLC.

140.    On January 31, 2024, Borrower WC Coal submitted Requisition Certificate No. 9 in the total amount of $537,223.00 for the payment of purportedly legitimate and reimbursable Project Costs. Borrower WC Coal's Requisition was deceptive and misleading because it was not

used to pay Project Costs. Instead, this Requisition included impermissible payments to Borrower WC Coal's related parties, American Resources Corporation and Land Betterment Corporation.

141.    On February 26, 2024, Borrower WC Coal submitted Requisition Certificate No. 10 in the total amount of $1,010,248.00 for the payment of purportedly legitimate and reimbursable Project Costs. Borrower WC Coal's Requisition was deceptive and misleading because it was not used to pay Project Costs. Instead, this Requisition included impermissible payments to Borrower WC Coal's related parties, American Resources Corporation and Land Betterment Corporation.

142.    On March 27, 2024, Borrower WC Coal submitted Requisition Certificate No. 11 in the total amount of $585,248.00 for the payment of purportedly legitimate and reimbursable Project Costs. Borrower WC Coal's Requisition was deceptive and misleading because it was not used to pay Project Costs. Instead, this Requisition included impermissible payments to Borrower WC Coal's related parties, American Resources Corporation and Land Betterment Corporation.

143.    On April 2, 2024, Borrower WC Coal submitted Requisition Certificate No. 12 in the total amount of $3,071,106.00 for the payment of purportedly legitimate and reimbursable Project Costs. Borrower WC Coal's Requisition was deceptive and misleading because it was not used to pay Project Costs. Instead, this Requisition included impermissible payments to Borrower WC Coal's related parties, ReElement Technologies Corporation, McCoy Elkhorn Coal LLC, and Land Betterment Corporation.

144.    On April 29, 2024, Borrower WC Coal submitted Requisition Certificate No. 13 in the total amount of $910,248.00 for the payment of purportedly legitimate and reimbursable Project Costs. Borrower WC Coal's Requisition was deceptive and misleading because it was not used to pay Project Costs. Instead, this Requisition included impermissible payments to Borrower

WC Coal's related parties, American Resources Corporation, ReElement Technologies Corporation, and Land Betterment Corporation.

145.    On June 27, 2024, Borrower WC Coal submitted Requisition Certificate No. 16 in the total amount of $616,237.60 for the payment of purportedly legitimate and reimbursable Project Costs. Borrower WC Coal's Requisition was deceptive and misleading because it was not used to pay Project Costs. Instead, this Requisition included impermissible payments to Borrower WC Coal's related parties, American Resources Corporation, ReElement Technologies Corporation, and Land Betterment Corporation.

146.    On August 30, 2024, Borrower WC Coal submitted Requisition Certificate No. 18 in the total amount of $715,540.00 for the payment of purportedly legitimate and reimbursable Project Costs. Borrower WC Coal's Requisition was deceptive and misleading because it was not used to pay Project Costs.

147.    On September 27, 2024, Borrower WC Coal submitted Requisition Certificate No. 20 in the total amount of $1,012,432.00 for the payment of purportedly legitimate and reimbursable Project Costs. Borrower WC Coal's Requisition was deceptive and misleading because it was not used to pay Project Costs.

148.    On October 10, 2024, Borrower WC Coal submitted Requisition Certificate No. 21 in the total amount of $240,000.00 for the payment of purportedly legitimate and reimbursable Project Costs. Borrower WC Coal's Requisition was deceptive and misleading because it was not used to pay Project Costs.

149.    On October 25, 2024, Borrower WC Coal submitted Requisition Certificate No. 22 in the total amount of $500,000 for the payment of purportedly legitimate and reimbursable Project Costs. Borrower WC Coal's Requisition was deceptive and misleading because it was not used to

pay Project Costs. Instead, this Requisition included impermissible payments to Borrower WC Coal's related party, Land Betterment Corporation.

150.    On October 31, 2024, Borrower WC Coal submitted Requisition Certificate No. 23 in the total amount of $1,213,136.88 for the payment of purportedly legitimate and reimbursable Project Costs. Borrower WC Coal's Requisition was deceptive and misleading because it was not used to pay Project Costs.

151.    On November 19, 2024, Borrower WC Coal submitted Requisition Certificate No. 24 in the total amount of $206,358.00 for the payment of purportedly legitimate and reimbursable Project Costs. Borrower WC Coal's Requisition was deceptive and misleading because it was not used to pay Project Costs. Instead, this Requisition included impermissible payments to Borrower WC Coal's related party, Land Betterment Corporation.

152.    On December 20, 2024, Borrower WC Coal submitted Requisition Certificate No. 25 in the total amount of $612,432.00 for the payment of purportedly legitimate and reimbursable Project Costs. Borrower WC Coal's Requisition was deceptive and misleading because it was not used to pay Project Costs. Instead, this Requisition included impermissible payments to Borrower WC Coal's related parties, American Resources Corporation and Land Betterment Corporation.

153.    On January 8, 2025, Borrower WC Coal submitted Requisition Certificate No. 26 in the total amount of $633,575.00 for the payment of purportedly legitimate and reimbursable Project Costs. Borrower WC Coal's Requisition was deceptive and misleading because it was not used to pay Project Costs. Instead, this Requisition included impermissible payments to Borrower WC Coal's related party, ReElement Technologies Corporation.

154.    On January 31, 2025, Borrower WC Coal submitted Requisition Certificate No. 27 in the total amount of $1,040,540.00 for the payment of purportedly legitimate and reimbursable

Project Costs. Borrower WC Coal's Requisition was deceptive and misleading because it was not used to pay Project Costs. Instead, this Requisition included impermissible payments to Borrower WC Coal's related parties, American Resources Corporation, ReElement Technologies Corporation, and Land Betterment Corporation.

155.    On March 24, 2025, Borrower WC Coal submitted Requisition Certificate No. 28 in the total amount of $26,421.21 for the payment of purportedly legitimate and reimbursable Project Costs. Borrower WC Coal's Requisition was deceptive and misleading because it was not used to pay Project Costs.

> iv.    **Guarantor American Infrastructure Corporation concealed material information about its legal problems.**

156.    In addition to the misrepresentations discussed above, Guarantor American Infrastructure Corporation (which is the sole member of Borrower WC Coal) failed to disclose material information prior to the issuance of the Bonds: at the time that Borrower WC Coal sought proceeds from the Bonds, Guarantor American Infrastructure Corporation was embroiled in significant litigation implicating its repayment of loans and truthfulness in disclosures.

157.    Under § 20(b) of the Guaranty, Guarantor American Infrastructure Corporation certified to the Trustee in June 2023 that "Except as otherwise previously disclosed to the holder of the Bonds, there are no actions, suits, proceedings, or investigations pending or, to the knowledge of the Guarantor, threatened against any Guarantor at law or in equity or before or by an official body which would, either in any individual case or in the aggregate, reasonably be expected to result in a material adverse effect on such Guarantor's ability to perform its obligations under this Agreement."

158.    That certification to the Trustee in the Guaranty was false because Guarantor American Infrastructure Corporation had two material lawsuits pending at the time.

159.    First, on October 25, 2021, Guarantor American Infrastructure Corporation was sued in *Big Sandy Company, L.P. v. American Carbon Corporation*, Case No.7:21-cv-00088 (E.D. Ky.) for breach of contract for failing to operate a coal mine in Pike County, Kentucky, as it was obligated to do under a lease agreement and for failing to make required lease payments. More specifically, Guarantor American Infrastructure Corporation was required, among other things, to "commence mining as soon as practicable and continue to diligently mine in an efficient, workmanlike, and proper manner." (*Big Sandy Company, L.P. v. American Carbon Corporation*, Doc. # 46-4 at § 3.2). The Plaintiff sought millions in damages from Guarantor American Infrastructure Corporation in that suit, which was in the midst of summary judgment proceedings exactly when Guarantor American Infrastructure Corporation falsely certified to the Trustee that it was not a party to such an action. Ultimately, in November 2023, the U.S. District Court for the Eastern District of Kentucky granted summary judgment against Guarantor American Infrastructure Corporation and awarded the plaintiff $23.88 million for Guarantor American Infrastructure Corporation's contractual breaches.

160.    Second, on November 3, 2021, Guarantor American Infrastructure Corporation—while operating under its previous name, Quest Energy Corporation—was sued by Ray Slone and Barbara Slone for its failure to make royalty payments from operating a mine that Guarantor American Infrastructure Corporation purchased from Ray and Barbara Slone. (*See Quest Energy Corporation, et al., v. Ray Slone et al.,* No. 2024-CA-0474-MR, Ky. Ct. App., Opinion filed September 19, 2025.) On June 8, 2023, this lawsuit was in the late stages of discovery when Guarantor American Infrastructure Corporation falsely certified to the Trustee that it was not a party to such an action. Ultimately, the Knott County District Court granted a motion for summary judgment and allowed the plaintiffs in that action to pierce the corporate veil. The Court found

Guarantor American Infrastructure Corporation, Mark Jensen, and Thomas Sauve jointly and severally liable for their contractual breaches.

161.    Guarantor American Infrastructure Corporation was well aware in June 2023 that there were "actions, suits, proceedings, or investigations pending . . . at law or in equity" which would "reasonably be expected to result in a material adverse effect on such [its] ability to perform its obligations." Guarantor American Infrastructure Corporation failed to disclose these civil actions to the Trustee.

**H.    Facts Relating to Borrower WC Coal's Fraudulent Transfer of Bond Proceeds to Related Parties**

162.    In addition to its failure to operate the Project, Borrower WC Coal has engaged in fraudulent transfers of millions of dollars from the Project's Operating Fund, which Borrower WC Coal accomplished by repeatedly submitting to the Trustee disbursement requests, also known as Requisitions, that impermissibly sought bond proceeds for Borrower WC Coal's related entities.

163.    From on or around June 2023 and continuing until at least March 2025, Borrower WC Coal sought and obtained approximately $33,500,000 through a series of monthly disbursement requests to the Trustee, which resulted in little if any of those bond proceeds benefiting the Project itself.

164.    Pursuant to § 4.2(b) of the Loan Agreement, on each Monthly Disbursement Date, Borrower WC Coal is required to determine the amount of Operating Expenses coming due and transfer the remaining funds to the Trustee for disbursement in accordance with the terms of the Indenture.

165.    Section 4.2(b) of the Loan Agreement expressly forbids Borrower WC Coal from transferring any money in the Operating Account to its members.

166.    Section 4.03(a) of the Indenture states:

The Trustee may disburse money from the accounts within the Project Fund . . . upon receipt of a Requisition from the Borrower [WC Coal] signed by its Borrower [WC Coal] Representative. . . The Trustee may conclusively rely on any Requisition signed by the Borrower [WC Coal] Representative and on the representations and certifications set forth in each such Requisition and schedules thereto. Upon receipt of a properly submitted Requisition, the Trustee shall remit payment within 5 Business Days.

167.    Section 6.20 of the Loan Agreement requires Borrower WC Coal to maintain a Separate Corporate Existence.

168.    Section 6.20(c) of the Loan Agreement provides that Borrower WC Coal:

Will maintain its own separate books and records, bank accounts and its own books of account, in each case that are separate and apart from the books and records, bank accounts and books of account of any other person; provided, however, that the Borrower [WC Coal]'s assets may be included in a consolidated financial statement of a direct or indirect shareholder or other owner of a beneficial interest of the Borrower [WC Coal] if inclusion on such consolidated financial statement is required to comply with the requirement of GAAP of the relevant jurisdiction, but only if (i) such consolidated financial statement shall be appropriately footnoted to the effect that the Borrower [WC Coal]'s assets are owned by the Borrower [WC Coal] and that they are being included on the consolidated financial statement of such shareholder or other owner of a beneficial interest only to comply with the requirements of GAAP of the relevant jurisdiction and (ii) such assets shall be listed on the Borrower [WC Coal]'s own separate balance sheet;

169.    On information and belief, Borrower WC Coal does not maintain its own bank account for use in Project activities and does not maintain books and records separate and apart from its corporate parent or affiliates. Borrower WC Coal has failed to produce its own books and records. Instead, the insufficient materials submitted purportedly to qualify as annual financial reporting are the financial reports of American Resources Company without the appropriate footnotes and separate balance sheet described in § 6.20(c) of the Loan Agreement.

170.    Section 6.20(e) of the Loan Agreement provides that Borrower WC Coal "[w]ill not commingle its funds or assets with those of any other Person."

171.    On information and belief, Borrower WC Coal caused funds provided pursuant to its Requisitions to be deposited or transferred directly to accounts of affiliates, which accounts were not used solely for Project-related expenses, in violation of § 6.20(e) of the Loan Agreement.

172.    Section 6.20(i) of the Loan Agreement provides that Borrower WC Coal "[w]ill observe all corporate formalities and do all things necessary to preserve its existence."

173.    On information and belief, Borrower WC Coal has failed to conduct board meetings, maintain minutes of those meetings, maintain its own financial statements, or observe the other required corporate formalities required to maintain its own separate existence, in violation of § 6.20(i) of the Loan Agreement.

174.    Section 6.20(o) of the Loan Agreement provides that Borrower WC Coal "[w]ill maintain adequate capital in the light of its contemplated business operations."

175.    American Resources Corporation reporting on the Project on June 2, 2025, in a Form 10-K submitted to the United States Securities and Exchange Commission, stated, "Due to a delay in government approvals and the expansion of rare earth concentrations it is undeterminable as to when meaningful operations will commence and the additional capital expenditures required." Borrower WC Coal, through its parent corporation, therefore reported that it does not have sufficient capital to maintain its business operations.

176.    Section 6.20(s) of the Loan Agreement provides that Borrower WC Coal "[w]ill maintain an arm's length relationship with its Affiliates (as defined below) and, except as permitted by the Financing Documents, enter into transactions with Affiliates only on an arm's-length basis in the ordinary course of business pursuant to written enforceable agreements."

177.    Section 1.01 of the Indenture defines Affiliate to mean, "a Person controlling, controlled by, or under common control with, another Person." Person, in turn, means, "an

individual, corporation, company, firm, association, voluntary association, partnership, joint venture, trust, limited liability company, unincorporated organization or other legal entity or group of entities, including a governmental entity or any agency or political subdivision thereof."

178.    Upon information and belief, Borrower WC Coal's directors, officers, or persons in control of Borrower WC Coal at all relevant times have included Chief Executive Officer Tarlis Thompson, former Chief Executive Officer Mark Jensen, former President Thomas Sauve, and former Chief Financial Officer Kirk Taylor.

179.    On information and belief, none of the transactions that Borrower WC Coal entered into with Affiliates, as described in the Requisitions, were made pursuant to written enforceable agreements or subject to any arms' length negotiations.

     **i.**     **Borrower WC Coal fraudulently transferred funds to related party American Resources Corporation in the form of so-called "project management fees."**

180.    Upon information and belief, Borrower WC Coal engaged its own parent, American Resources Corporation, purportedly to manage the Project.

181.    Borrower WC Coal is a wholly owned subsidiary of Guarantor American Infrastructure Corporation.

182.    At all relevant times, Guarantor American Infrastructure Corporation was a wholly owned subsidiary of American Resources Corporation.

183.    Upon information and belief, the directors, officers, or persons in control of American Resources Corporation are nearly identical to the directors, officers, or persons in control of Borrower WC Coal, including Chief Executive Officer Mark C. Jensen, Chief Financial Officer Kirk Taylor, President and Director Thomas Sauve, and Chief Operating Officer Tarlis Thompson.

184.    Upon information and belief, through a series of transactions, Borrower WC Coal transferred money from the Operating Account to American Resources Corporation for supposed "project management fees."

185.    Borrower WC Coal typically paid $75,000 on a weekly basis to its related party, American Resources Corporation, for these professed "project management fees," which yielded little, if any, benefit to the Project.

186.    Upon information and belief, Borrower WC Coal's transfers to American Resources Corporation occurred while Borrower WC Coal was insolvent.

187.    One transfer of this type from Borrower WC Coal to American Resources Corporation occurred on or about April 29, 2024.

**ii.    Borrower WC Coal fraudulently transferred funds to related party Knott County Coal LLC to assist in deconstructing a Kentucky coal facility and to purchase used equipment.**

188.    Upon information and belief, rather than using bond proceeds for the Project in West Virginia as required, Borrower WC Coal has instead impermissibly transferred funds to benefit a separate coal location in a different state, namely, Knott County, Kentucky.

189.    Upon information and belief, Knott County Coal LLC is a wholly owned subsidiary of Guarantor American Infrastructure Corporation.

190.    Upon information and belief, through a series of transactions, Borrower WC Coal impermissibly transferred money from the Operating Account to Knott County Coal LLC.

191.    On information and belief, the money Borrower WC Coal transferred to Knott County Coal LLC is being used to deconstruct and sell used equipment from the Knott County Coal LLC facility purportedly for subsequent re-use at Wyoming County Coal.

192.    One such transfer by Borrower WC Coal occurred on or about November 30, 2023, in which Borrower WC Coal impermissibly paid $3,525,000 to its related party, Knott County

Coal LLC, for used equipment located in Kentucky, which yielded little, if any, benefit to the Project in West Virginia.

193.    Upon information and belief, Borrower WC Coal's transfers to Knott County Coal LLC occurred while Borrower WC Coal was insolvent.

194.    The used Knott County Coal LLC equipment from Kentucky that Borrower WC Coal allegedly purchased is unaccounted for and is not present at the Project site in Wyoming County, West Virginia.

### iii.    Borrower WC Coal fraudulently transferred funds to related party McCoy Elkhorn Coal LLC purportedly to purchase used equipment in Pike County, Kentucky.

195.    Upon information and belief, rather than use bond proceeds for the Project in West Virginia as required, Borrower WC Coal has instead impermissibly transferred funds to purchase equipment in another state, Kentucky, in the possession, custody, or control of yet another related party, McCoy Elkhorn Coal LLC.

196.    Upon information and belief, McCoy Elkhorn Coal LLC is a wholly owned subsidiary of American Infrastructure.

197.    Upon information and belief, through a series of transactions, Borrower WC Coal transferred money from the Operating Account to McCoy Elkhorn Coal LLC.

198.    One such transfer from Borrower WC Coal to McCoy Elkhorn Coal LLC occurred on or about September 27, 2023, in which Borrower WC Coal impermissibly paid $1,200,000 to its related party, McCoy Elkhorn Coal LLC, for used equipment located in Kentucky, which yielded little, if any, benefit to the Project in West Virginia.

199.    Upon information and belief, Borrower WC Coal's transfers to McCoy Elkhorn Coal LLC occurred while Borrower WC Coal was insolvent.

200.    The used McCoy Elkhorn Coal LLC equipment from Kentucky that Borrower WC Coal allegedly purchased is unaccounted for and is not present at the Project site in Wyoming County, West Virginia.

   **iv.    Borrower WC Coal transferred funds to related party ReElement Technologies Corporation in the form of so-called "rare earth processing" fees.**

201.    Borrower WC Coal engaged ReElement Technologies Corporation for the supposed purpose of advising Wyoming County Coal about rare earth processing capabilities.

202.    Upon information and belief, the directors, officers, or persons in control of ReElement Technologies Corporation are nearly identical to the directors, officers, or persons in control of Borrower WC Coal, including Chief Executive Officer Mark C. Jensen, Chief Financial Officer Kirk Taylor, President and Director Thomas Sauve.

203.    Upon information and belief, through a series of transactions, Borrower WC Coal transferred money from the Operating Account to ReElement Technologies Corporation for supposed "rare earth processing" fees.

204.    Borrower WC Coal typically paid its related party, ReElement Technologies Corporation, on a weekly basis in varying amounts of either $75,000 or $125,000 for these professed "rare earth processing" fees which yielded little, if any, benefit to the Project.

205.    One such transfer from Borrower WC Coal occurred on or about January 8, 2025, in which Borrower WC Coal impermissibly paid $633,575 to its related party, ReElement Technologies Corporation, for these professed "rare earth processing" fees.

206.    Upon information and belief, Borrower WC Coal's transfers to ReElement Technologies Corporation occurred while Borrower WC Coal was insolvent.

207.    Despite Borrower WC Coal's disbursement requests to the Trustee, no improvements exist at the Project site in West Virginia for the professed purpose of rare earth processing.

> **v.    Borrower WC Coal fraudulently transferred funds to related party Land Betterment Corporation in the form of supposed "outsourced land development" fees.**

208.    Upon information and belief, Borrower WC Coal engaged Land Betterment Corporation to assist with supposed land redevelopment at the Project in Wyoming County, West Virginia.

209.    Upon information and belief, the directors, officers, or persons in control of Land Betterment Corporation nearly identical to the directors, officers, or persons in control of Borrower WC Coal, including President, Chief Financial Officer, and Director Kirk Taylor, Chief Development Officer and Director Thomas Sauve, and Director of Operations Tarlis Thompson.

210.    Upon information and belief, Borrower WC Coal transferred money from the Operating Fund to Land Betterment Corporation in the form of supposed "outsourced land development" fees in a typical weekly payment of $50,000, which yielded no discernible benefit to the Project in West Virginia.

211.    Upon information and belief, Borrower WC Coal's transfers to Land Betterment Corporation occurred while Borrower WC Coal was insolvent.

212.    One such impermissible transfer from Borrower WC Coal to Land Betterment Corporation occurred on or about November 19, 2024, for $200,000, even though this payment yielded no discernible benefit to the Project.

> **vi.    Each of the Transfers were made to a related entity, and Borrower WC Coal did not receive equivalent value in exchange for these fraudulent transfers.**

213.    Each of Borrower WC Coal's transfers or series of transfers outlined in ¶¶ 180–212 is a "<u>Transfer</u>" or, collectively, the "<u>Transfers</u>."

214.    Borrower WC Coal's Transfers were made to Borrower WC Coal, Guarantor American Infrastructure Corporation, American Resources Corporation, Land Betterment Corporation, ReElement Technologies Corporation, Knott County Coal LLC, and McCoy Elkhorn Coal LLC, which are affiliates or insiders as those terms are defined in W. Va. Code § 40-1A-1.

215.    Not only are Defendants' executives and principals substantially the same, but Defendants are also owned by, related to, or under substantially the same management and control of the same corporate parent—American Resources Corporation.

216.    Each of the Transfers was not made in the ordinary course of business because Borrower WC Coal did not receive reasonably equivalent value in exchange therefor.

217.    The Transfers were made with actual intent to hinder, delay, or defraud the Trustee because the existence of these Transfers was concealed from the Trustee and the Transfers were made to the exclusion of payments required to be made under the Bond Documents, all while Borrower WC Coal flouted the financial controls provided in the Bond Documents.

218.    Borrower WC Coal fraudulently and artificially inflated Operating Expenses to siphon funds required to be used for Operating Expenses for the benefit of insiders and affiliates while concealing that fact.

219.    Borrower WC Coal retained control and/or custody of the funds after each Transfer because the transferees are insiders and affiliates of Borrower WC Coal.

220.    Borrower WC Coal's pattern of transferring monies from the Operating Account to insiders and affiliates has occurred since the commencement of the Project and continues to occur.

221.    All amounts transferred to insiders and affiliates of Borrower WC Coal since the date of the Loan Agreement were required to be paid to the Trustee in accordance with the Loan Agreement.

222.    At all relevant times, Borrower WC Coal was insolvent as that term is defined in W. Va. Code § 40-1A-2.

223.    As explained previously, Borrower WC Coal has failed to maintain adequate Days' Cash on Hand of at least 45 days as required by § 6.4(b)(iii) of the Loan Agreement, and therefore Borrower WC Coal lacks the independent capitalization required to continue its operations in violation of § 6.20(o) of the Loan Agreement.

224.    On information and belief, Borrower WC Coal has failed to conduct board meetings, maintain minutes of those meetings, maintain its own financial statements, or observe the other required corporate formalities required to maintain its own separate existence.

225.    Using Bond proceeds, Borrower WC Coal purportedly purchased decades-old, used equipment from its Affiliates McCoy Elkhorn Coal LLC and Knott County Coal LLC but is not in possession of said equipment and cannot identify the location of the equipment.

226.    As outlined further below, Borrower WC Coal has engaged in numerous other transactions with Affiliates that were not conducted at arm's length, including but not limited to its transactions with American Resources Corporation, Land Betterment Corporation, Knott County Coal LLC, McCoy Elkhorn Coal LLC, and ReElement Technologies Corporation.

227.    The Transfers are a breach of §§ 4.2(b) and 6.20 of the Loan Agreement.

228.    Under West Virginia law, the Trustee is entitled to recover from Borrower WC Coal, its insiders and affiliates, and any other subsequent, knowing recipients all money from the

Operating Fund that was fraudulently transferred by or on behalf of Borrower WC Coal, including any other yet-unknown amounts transferred by Borrower WC Coal to insiders and affiliates.

## COUNT ONE – BREACH OF CONTRACT
## AGAINST BORROWER WC COAL AND GUARANTOR AMERICAN
## INFRASTRUCTURE CORPORATION

229.    The Trustee restates and realleges the preceding paragraphs.

230.    The Trustee and Borrower WC Coal are parties to the Loan Agreement and Note, in addition to the other Bond Documents.

231.    The Trustee and Guarantor American Infrastructure Corporation are parties to the Guaranty.

232.    The Loan Agreement, Note, Guaranty, and all Bond Documents set forth the respective obligations of the parties thereto.

233.    Borrower WC Coal has breached the Bond Documents, including but not limited to the Loan Agreement, by, among other things, failing to provide funds sufficient to make Loan Repayments into the Bond Fund, failing to provide the Trustee with quarterly and annual financial and operating reports, failing to provide an annual budget, failing to maintain the required Debt Service Coverage Ratio and Days' Cash on Hand Required by the Loan Agreement, and failing to operate the Project in a manner that would allow Borrower WC Coal to repay its obligations with the Project Revenues.

234.    Guarantor American Infrastructure Corporation has breached the Guaranty by failing to timely fulfill the obligations of Borrower WC Coal upon demand by the Trustee.

235.    As of November 15, 2025, there is due and owing principal on the Loan in the sum of $45,000,000.00 together with accrued and accruing interest, default interest, advances, and other fees, charges and costs including attorneys' fees and costs recoverable under the Bond Documents.

236. The Trustee has been damaged by Borrower WC Coal and Guarantor American Infrastructure Corporation actions in an amount in excess of $40,000,000.00.

237. The Trustee is entitled to judgment against Borrower WC Coal and Guarantor American Infrastructure Corporation in an amount no less than $40,000,000.00, plus accrued and accruing interest, default interest, advances, attorneys' fees and costs, and other fees, charges, and costs recoverable under the Bond Documents and as allowed by law, along with specific performance of Borrower WC Coal's and Guarantor American Infrastructure Corporation's obligations under the Bond Documents.

## COUNT TWO – IMMEDIATE POSSESSION – AGAINST BORROWER WC COAL

238. The Trustee restates and realleges the preceding paragraphs.

239. The Deed of Trust encumbers Fixtures, Equipment, As-Extracted Collateral and Personal Property (as more fully defined in the Deed of Trust).

240. Borrower WC Coal has breached the Bond Documents, including but not limited to the Loan Agreement, by, among other things, failing to provide funds sufficient to make Loan Repayments into the Bond Fund, failing to provide the Trustee with quarterly and annual financial and operating reports, failing to provide an annual budget, failing to maintain the required Debt Service Coverage Ratio and Days' Cash on Hand Required by the Loan Agreement, and failing to operate the Project in a manner that would allow Borrower WC Coal to repay its obligations with Project Revenues.

241. Based on the Events of Default, the Trustee has an absolute right to immediate possession of the Fixtures, Equipment, As-Extracted Collateral, and Personal Property pursuant to the Bond Documents and in accordance with W. Va. Code § 55-6-1 *et seq*.

242. The Trustee is entitled to an order of the Court finding that the Trustee is entitled to immediate possession of the Fixtures, Equipment, As-Extracted Collateral, and Personal

Property described in the Mortgage, and that the Trustee may dispose of such Fixtures, Equipment, As-Extracted Collateral, and Personal Property in accordance with Article 9 of the Uniform Commercial Code, the Bond Documents, and any other applicable law.

### COUNT THREE – ACCOUNTING – AGAINST BORROWER WC COAL

243.    The Trustee restates and realleges the preceding paragraphs.

244.    The Loan Agreement is a valid contract between Borrower WC Coal and the Trustee.

245.    Borrower WC Coal was provided monies under the Loan Agreement, which obligate Borrower WC Coal to account for those monies to the Trustee.

246.    Specifically, as laid out more fully above, pursuant to the Loan Agreement, Borrower WC Coal is required to provide the Trustee, among other things, audited financial statements and a Budget of anticipated Gross Revenue and Operating Expenses.

247.    A duty to account was imposed on Borrower WC Coal, and Borrower WC Coal has failed to account for monies Borrower WC Coal received, which failure has rendered the Trustee unable to state the exact amount due and owing.

248.    Borrower WC Coal has breached the Loan Agreement.

249.    Therefore, the Trustee is entitled to an accounting of Borrower WC Coal's operations and to access all of Borrower WC Coal's books, records, and financial statements.

### COUNT FOUR – FRAUDULENT TRANSFER
### AGAINST BORROWER WC COAL, GUARANTOR AMERICAN INFRASTRUCTURE CORPORATION, AMERICAN RESOURCES CORPORATION, LAND BETTERMENT CORPORATION, REELEMENT TECHNOLOGIES CORPORATION, KNOTT COUNTY COAL LLC, AND MCCOY ELKHORN COAL LLC

250.    The Trustee restates and realleges the preceding paragraphs.

251.    At all relevant times, the Trustee was a creditor of Borrower WC Coal pursuant to the Bond Documents.

252.    At all relevant times, Borrower WC Coal was a debtor of the Trustee, and Borrower WC Coal was insolvent within the definition of W. Va. Code § 40-1A-1.

253.    At all relevant times, the Trustee held claims against Borrower WC Coal pursuant to the Bond Documents.

254.    Upon information and belief, since the Bonds were issued in 2023, Borrower WC Coal has transferred funds to insiders and affiliates, including the Transfers set forth above, which funds have not been repaid to Borrower WC Coal and have not been provided to the Trustee pursuant to the Bond Documents.

255.    Upon information and belief, Borrower WC Coal transferred the money with the actual intent to hinder, delay, or defraud the Trustee's attempt to collect amounts due under the Bond Documents.

256.    Upon information and belief, Borrower WC Coal made transfers, including the Transfers set forth above, without receiving a reasonably equivalent value in exchange for the transfers.

257.    The activities and conduct of Borrower WC Coal, Guarantor American Infrastructure Corporation, American Resources Corporation, Land Betterment Corporation, ReElement Technologies Corporation, Knott County Coal LLC, and McCoy Elkhorn Coal LLC diminished the Project's value by abusing their insider status to funnel Operating Expenses to themselves and other insiders and affiliates, while at the same time allowing the Project to flounder and failing to operate the Project at a level at which the Project revenues would repay Borrower WC Coal's obligations.

258.    Upon information and belief, at the time of the fraudulent transfers, including the Transfers set forth above, Borrower WC Coal was engaged or was about to engage in a business

or transaction for which the remaining assets of Borrower WC Coal were unreasonably small in relation to the business or transaction.

259.    Upon information and belief, at the time of the fraudulent transfers, including the Transfers set forth above, Borrower WC Coal intended to incur, or believed or reasonably should have believed that Borrower WC Coal would incur, debts beyond its ability to pay as they became due.

260.    Upon information and belief, at the time of the fraudulent transfers, Borrower WC Coal was either insolvent or became insolvent as a result of the transfers.

261.    At the time of the fraudulent transfers, Borrower WC Coal, Guarantor American Infrastructure Corporation, American Resources Corporation, Land Betterment Corporation, ReElement Technologies Corporation, Knott County Coal LLC, and McCoy Elkhorn Coal LLC had actual knowledge of Borrower WC Coal's insolvency.

262.    The Trustee has been detrimentally affected by these fraudulent transfers because the funds consisted of Operating Expenses and Project Revenues owed to the Trustee, not other entities.

263.    The Trustee is entitled to avoid all fraudulent transfers to insiders and affiliates pursuant to W. Va. Code § 40-1A-4 and W. Va. Code § 40-1A-5. Accordingly, the Trustee is entitled to judgment against the recipients of any and all fraudulently transferred funds.

264.    This count expressly includes all fraudulent or voidable transfers made by Borrower WC Coal and not yet known to the Trustee, but to be uncovered in discovery.

### COUNT FIVE – FRAUDULENT MISREPRESENTATION AGAINST BORROWER WC COAL

265.    The Trustee restates and realleges the preceding paragraphs.

266.     As set forth herein, Borrower WC Coal routinely made false and deceptive statement in its Monthly Project Reports and Requisitions to the Trustee.

267.     The Trustee was required to rely upon the representations of Borrower WC Coal pursuant to the Indenture and did rely upon the representations of Borrower WC Coal contained within Borrower WC Coal's Requisitions and Monthly Project Reports when the Trustee disbursed funds to Borrower WC Coal's Operating Account.

268.     The Trustee was damaged as a result of Borrower WC Coal's knowing and unlawful acts and omissions contained within its falsified Requisitions because the Trustee lost the opportunity to avoid the transactions sooner and has incurred, and will continue to incur, attorneys' fees and other damages not recoverable under the Bond Documents as a result of Borrower's fraudulent misrepresentations in its Monthly Project Reports and Requisitions.

269.     Accordingly, the Trustee is entitled to damages in the amount of all Requisitions paid pursuant to Borrower WC Coal's fraudulent misrepresentations, attorneys' fees and costs, and punitive damages against Borrower WC Coal.

**COUNT SIX – CIVIL CONSPIRACY
AGAINST GUARANTOR AMERICAN INFRASTRUCTURE CORPORATION,
AMERICAN RESOURCES CORPORATION, LAND BETTERMENT CORPORATION,
REELEMENT TECHNOLOGIES CORPORATION, KNOTT COUNTY COAL LLC,
AND MCCOY ELKHORN COAL LLC**

270.     The Trustee restates and realleges the preceding paragraphs.

271.     Guarantor American Infrastructure Corporation, American Resources Corporation, Land Betterment Corporation, ReElement Technologies Corporation, Knott County Coal LLC, and McCoy Elkhorn Coal LLC knowingly accepted funds from Borrower WC Coal that would not be used for the Project.

272.     Additionally, Guarantor American Infrastructure Corporation, American Resources Corporation, Land Betterment Corporation, ReElement Technologies Corporation,

Knott County Coal LLC, and McCoy Elkhorn Coal LLC each knew that the funds they received were being disbursed by the Trustee for use on the Project.

273.    Guarantor American Infrastructure Corporation, American Resources Corporation, Land Betterment Corporation, ReElement Technologies Corporation, Knott County Coal LLC, and McCoy Elkhorn Coal LLC used these funds for their benefit and to the Trustee's exclusion.

274.    Guarantor American Infrastructure Corporation, American Resources Corporation, Land Betterment Corporation, ReElement Technologies Corporation, Knott County Coal LLC, and McCoy Elkhorn Coal LLC each acted in concert with Borrower WC Coal to defraud the Trustee and receive funds from the Project for their own benefit.

275.    Guarantor American Infrastructure Corporation, American Resources Corporation, Land Betterment Corporation, ReElement Technologies Corporation, Knott County Coal LLC, and McCoy Elkhorn Coal LLC damaged the Trustee when they provided knowing assistance to Borrower WC Coal in making its fraudulent misrepresentations.

276.    Accordingly, the Trustee is entitled to damages in the amount of all Requisitions paid pursuant to Borrower WC Coal's fraudulent misrepresentations, attorneys' fees and costs, and punitive damages against Guarantor American Infrastructure Corporation, American Resources Corporation, Land Betterment Corporation, ReElement Technologies Corporation, Knott County Coal LLC, and McCoy Elkhorn Coal LLC, jointly and severally with Borrower WC Coal.

**WHEREFORE**, the Trustee asks that the Court grant the Trustee the following relief:

(1)    A judgment against Borrower WC Coal and Guarantor American Infrastructure Corporation in an amount in excess of $40,000,000 together with accrued and accruing interest, default interest, expenses, advances, and other fees, charges, and

costs recoverable under the Bond Documents and applicable law, including reasonable attorneys' fees of the Trustee;

(2)     Entry of an order awarding the Trustee immediate possession of the Fixtures, Equipment, As-Extracted Collateral, and Personal Property;

(3)     Appointment of a receiver to take possession of and protect the Property, Fixtures, Equipment, As-Extracted Collateral, and Personal Property and to manage and operate the same and collect the rents and any other income generated therefrom;

(4)     Against Borrower WC Coal, Guarantor American Infrastructure Corporation, American Resources Corporation, Land Betterment Corporation, ReElement Technologies Corporation, Knott County Coal LLC, and McCoy Elkhorn Coal LLC, jointly and severally, a judgment avoiding and preserving the transfers for the Trustee; directing that the transfers be set aside; and recovering the transfers, or the value thereof from Borrower WC Coal, Guarantor American Infrastructure Corporation, American Resources Corporation, Land Betterment Corporation, ReElement Technologies Corporation, Knott County Coal LLC, and McCoy Elkhorn Coal LLC in an amount to be determined at trial;

(5)     A judgment against all Defendants jointly and severally for all amounts for which any one of them is deemed liable, on grounds that all Defendants are alter egos of one another;

(6)     An award of all damages above and punitive damages against Borrower WC Coal, Guarantor American Infrastructure Corporation, American Resources Corporation, Land Betterment Corporation, ReElement Technologies Corporation, Knott

County Coal LLC, and McCoy Elkhorn Coal LLC, jointly and severally, in an amount the court deems just and equitable.

(7)     An award of the Trustee's costs, expenses, and attorneys' fees in accordance with the Loan Agreement and other applicable law; and

(8)     Such other and further relief as the Court in its discretion may deem equitable and just.

Respectfully submitted,

Dated December 23, 2025

*/s/ Jared C. Helge*
Kay Dee Baird, Attorney No. 28821-73
Michael A. Moffatt, Attorney No. 36140-49
KRIEG DEVAULT LLP
One Indiana Square, Suite 2800
Indianapolis, Indiana 46204
Telephone:     (317) 636-4341 (Main)
               (317) 238-6306 (Direct – Baird)
               (317) 238-6309 (Direct – Moffatt)
Facsimile:     (317) 636-1507
E-Mails:       kbaird@kdlegal.com
               mmoffatt@kdlegal.com


William P. Wassweiler (*pro hac vice forthcoming*)
wassweilerw@ballardspahr.com
Karla M. Vehrs (*pro hac vice forthcoming*)
vehrsk@ballardspahr.com
Matthew Ebert (*pro hac vice forthcoming*)
ebertm@ballardspahr.com
BALLARD SPAHR LLP
80 South Eighth Street
2000 IDS Center
Minneapolis, Minnesota 55402-2119
Telephone:     (612) 371-3211
Facsimile:     (612) 371-3207


Jared C. Helge, Supreme Court No. 27152-02
ROTHBERG LOGAN & WARSCO LLP
505 East Washington Boulevard
P.O. Box 11647
Fort Wayne, Indiana 46859-1647
Telephone: (260) 422-9454
Facsimile: (260) 422-1622
jhelge@rothberg.com

*Counsel for Plaintiff*

## **VERIFICATION**

STATE OF MINNESOTA )
                                 ) ss

COUNTY OF HENNEPIN )

I, Michael Slade, being duly sworn, state that I am a Senior Vice President at UMB Bank, N.A., solely in its capacity as UMB Bank, N.A., as trustee of $45,000,000 West Virginia Economic Development Authority Solid Waste Disposal Facility Revenue Bonds (Wyoming County Coal Project), Series 2023, that I have read the foregoing Verified Complaint, and that the contents of the Verified Complaint are true and correct to the best of my knowledge.

_____
Michael Slade

Sworn to and subscribed before me this 23 day of December 2025.

_____
Notary Public

**Gerald Kwok**
Notary Public - Minnesota
My Comm. Exp: January 31, 2029